First case this morning is Elaine Stites et al v. Alan Ritchey Inc. Mr. Cerruti. My name is Jeremy Cerruti. I'm with the law firm Arp and Carp and I represent the three appellants in this case, Elaine Stites, Lauren Ball, and Barbara Buston. I'd like to reserve about three minutes for rebuttal time. Granted. Thank you. There are two main issues regarding this appeal, your honors. First is whether the district court improperly concluded that the appellants failed to establish pretext regarding their wrongful termination claims, their race discrimination claims. And the evidence I would suggest is yes. Number two, the second issue is the retaliation claims of my clients. And the issue that needs to be decided is whether the district court improperly concluded that the appellants failed to establish the causal link necessary for the retaliation claim. And I would suggest that the evidence in this case is overwhelmingly yes. Well, overwhelmingly, what evidence shows that the motivation in this case was anything other than the efficiency ratings? Well, your honor, regarding the retaliation claim, there's various ways, obviously, to prove the causal link. One is timing. In this case, regarding Ms. Stites, there's evidence in the record that she complained within the same week of her termination. She also complained a number of times over a year and a half before that, as did Ms. Ball. If there was retaliation, why weren't they fired or terminated earlier? She kept complaining. Sure. They did keep complaining. And I don't know why they weren't fired sooner. The point is, under the jurisprudence, because I understand it, we need to look at the most recent complaint in proximity to their termination. But that's not enough by itself, is it? Well, it is. Temporal proximity? Well, it can be, your honor. And for Ms. Stites, I would speak to that. By itself, with nothing else? Well, it raises the less than a week temporal proximity in this case, in and of itself, raises an inference of discrimination. But in addition to that, your honors, there's other evidence of causation. Such as? In addition to the timing. One is the various discriminatory comments that were made to all the appellants in this case. And are they in any way connected to, causally connected to the discharges? Well, yes. I mean, the comments... What's the link? Sure. The comments that were made by Ms. Yorkey, the supervisor, who participated in the decision to terminate my client, and who was responsible for allegedly deciding who was part of the reduction in force, was the one who made the comments. And the comments included Asians are better, they work faster, they don't complain, things like that. And when the defendant's, or the appellee's, reason for allegedly terminating my client is that they have low efficiency ratings, then comments directly related to that Asians work faster than non-Asians. But Bell and Buchman said that they weren't retaliated against, right? Right. And that's... Are we stuck with that, then? I don't think we are, your honor. I mean, the point of a retaliation claim, unlike a hostile work environment claim, for example, there is no subjective component. And certainly, at the summary judgment stage, you're looking at the pleadings, as well as deposition testimony, as well as other evidence. And in this case, unfortunately, the district court considered only that testimony. They didn't do the objective analysis of a retaliation claim, which requires the analysis, did they engage in protective activity? Was there an adverse action? And is there some causal link between the two? But other than the complaining, do we have anything else? The reason I ask is because, if complaining is enough, then we're running a causation requirement out of the retaliation cause of action. And anyone who complains automatically should survive summary judgment, right? No, absolutely. When I'm talking about the complaining judge, I'm talking, obviously, about satisfying the first link, the first element, which is... What do you have for causation, besides the fact that your clients, from time to time, complained? Well, the causation element under the Third Circuit is... It doesn't need to be anything specific, but obviously... It brings me something. So give us that something. What is that something? At the time, Judge, number one. Number two, the discriminatory comments that were made. And number three, the disparate treatment of Asians compared to non-Asians in the workplace. And when I say that, what I mean is, there's been testimony throughout the case that Asians were provided easier work, were provided work to make their performance evaluations, sorry, performance ratings much higher, and management knew about it. But all that goes, I think, to your discrimination claim. One thing that I think is curious about this case is that the strength of your discrimination argument seems to undermine your retaliation argument. I'd like you to address that, if I can explain what I mean. The crux of your discrimination argument is that the objective criterion used wasn't worth the paper it was written on, because the Asian unloaders were depriving your clients of the opportunity to compete on an equal footing with their peers. Is that fair? Yes, that's fair. Okay. Well, it still remains a fact that your clients didn't meet the objective numbers. So, if the stated reason for firing is the objective numbers, how can that help your retaliation claim? It might help you, if your premise is correct, namely the Asian unloaders were giving your clients the scut work, then that seems to scuttle your retaliation claim. I do, but I don't necessarily agree in the sense that when you're looking at the retaliation claim and the causal link, I think that our argument that management knew and was assisting the Asian employees in providing easier and better work to Asian employees. Well, that's discrimination, not retaliation, though. Well, it's retaliation in the sense that it's disparate treatment. And under the causal link for a retaliation claim, in addition to the things I mentioned, the timing and the discriminatory comments, the disparate treatment between Asians and non-Asians certainly can give rise to the link between the complaints on one hand and the termination on the other. You say that all of the unloaders were Asian. You say that at your brief at page 29. That is belied by the record here, though. I'm not sure when you're... Well, let's take a look at the roof analysis of 2006. You've got unloaders, Howard Tate, Sherry Lowe, Pat Curry, Monica Heller. Just for starters, none of them, I suggest, are Asian. Your primary argument, really, is that Asian unloaders gave all the good work to Asian inspectors. Well, let me ask you this question, if that is your theory, and it is in your brief. Non-Asian inspectors, Colleen Potter, Deborah Presley, Denise Spagnolia, all achieved efficiency scores that were better than most, if not most, Asian inspectors, and they weren't... Doesn't this undermine your price? I don't think it necessarily does, Your Honor. And the reason for that is, first, we don't need to prove that every single white person was discriminated against in the workplace. Well, your argument is that non-Asian workers were let go, and Asian workers almost to the exclusion of non-Asian workers. But these figures, these efficiency scores, and these women and others, were at the top, and they were Caucasians. Right. Your Honor, I would suggest that that's not at all... So we don't only have non-Caucasian unloaders, but we've got Caucasians that are being maintained because their efficiency scores are much higher than most of the Asians. What does this do to your pretext argument? Well, our argument is that the discrimination begins in the nature of the assignment of the work. So if the discrimination begins then, then certainly it may affect people differently. If only it were defined at the beginning of the work, what is that? Meaning how they're assigned work, how the unloaders and the material handlers are getting work to begin with. So there's somebody before the unloaders who is now the discriminatory person. No, Judge, what I'm saying is the manner in which my clients were given work, assigned, handed out, the type of work that they were Asian employees were giving other Asian employees work that required less time. But Asian employees, if you follow your theory, were also giving non-Asian employees work. Good work. Right, and it's not our contention that our clients were getting absolutely no work. That's not the contention. The contention is the type of work that they were given, and that they had to wait longer periods of time before. When Stites complained about the work she was getting, she was moved to a centrally located workstation, I think by Murphy. They sat with her, they counseled her, and they personally delivered work to her. Correct? Yes. Yeah, for a period, Judge. I mean, it's not our contention that they were completely deprived of work. It's our contention that... How is this consistent with creating a non... an all-Asian workforce? Well, the fact that the discriminatory practices didn't have the practical effect of lowering every single white person's efficiency rating is, I guess, is a good thing from my perspective. But, I mean, you acted in a discriminatory manner, and if the intent is to have that discrimination reflect in the efficiency ratings, and for most, or for many white people it does, and then you get rid of them, then, from my perspective, it's irrelevant that other white people have higher efficiency ratings, because maybe the discrimination effect... You haven't objected at any point to how the efficiency ratings are... what goes into calculating an efficiency rating. Right. And I don't think there is a dispute. I mean, efficiency ratings are based on the number, amount, and the nature of the pallets, and what work is getting done. Are you saying that the white employees who had good ratings were just the upper echelon of whites, and they were just so good, or are you saying that the evidence suggests that they got good work? Well, I think possibly both. I mean, possibly both, but the issue is just because the discrimination didn't affect all white people equally... Well, I understand that. The reason I ask the question is, there could have been discrimination, let's assume for a minute, that the Asian-Americans controlled the workflow, and let's assume for a minute they gave the Caucasians all the bad work. It still stands to reason that some white people might have been able to do so well that they overcame the discriminatory workflow. Right. And we've gone from a 10% Asian workforce to a 90% workforce, so clearly the Caucasians, either for an innocuous reason or for a discriminatory reason, have not thrived at this business. Yes, and I think based on the evidence, any reasonable jury could infer that it was for a discriminatory reason. I'm asking you not to hypothesize. I'm asking you to point to something in the record that seemed to do just fine. Was that because they got work from Caucasian unlawyers? Was that because they were the Jackie Robinsons of this plant? What's the reason why those Caucasian workers thrived when your clients failed? Well, I mean, they were able to overcome the discrimination. Well, Steitz said that until you got into the container and started looking through it, it was not possible to tell the quality of work in a given bin. That's what she said page 339 of the appendix. So then doesn't that kind of defeat your argument? No. How do they know that whoever they are is giving scud work to one and good work to another if one of your clients says it's not always possible to know what's in the bins until you get into them? Well, because Ms. Steitz actually went to Ms. Yorkey and addressed that specific issue. And Ms. Yorkey said, I understand. I know that you're not getting the work that the others are. So that's, I mean, she knew by notice. And then they cancelled with her, with Murphy. But if you're not getting the work that others are getting, and you're trying to increase your efficiency rating, and discrimination is initially the issue that's creating your less work, there is no way to increase your efficiency rating. And so a reasonable inference can be made that if you're being deprived of work in a discriminatory manner, then certainly your efficiency rating isn't going to be as high as the individuals who are getting the easier work and the work that makes their efficiency ratings higher. What did they make of the efforts of the employer here to remedy this problem of improper distribution, you know, favorable to certain groups? Are you saying that that was ineffectual or it was a sham or what? Your Honor, I'm not sure that I understand your question. Didn't they make an effort to stop this so-called distribution, favorable distribution to non-whites? Was there an effort by the employer here? No, as I understand it, Your Honor. Wasn't there something they tried to do about it? To my knowledge, there wasn't. Okay. Well, I know my clients spoke with management repeatedly and they said they would do something. Didn't managers get involved or something at one point? Well, Mr. Murphy did for a period, but that's why my clients continued to complain about if there wasn't, they were still getting the work. You're saying it had no effect? No, it didn't have any effect because Ms. Steith, as is underscored by the record, continued to complain up to her the last week of her termination. Is your argument that the Caucasians who scored at the top of the heap, let me see if I understand it, they didn't get the same amount of work, but they were able to do it better? They could have been able to do it better. Could have been. Yeah. All right. We'll hear you in a bit, Robert. Thank you. Thank you, Your Honor. Mr. Walsh? Yeah, Steith said that the supervisor stepped in and took over the distribution. I think so. For a while, yeah. Yeah. Thank you, Your Honor. The appellants here claim that the Asian unloaders were intentionally feeding easier or better work to their Asian co-workers, and because of that, the appellants here, the plaintiffs, struggled. They didn't have the same opportunity. They weren't working on the same footing, as Your Honor mentioned. It wasn't just that there were non-Asians that excelled. You mentioned three, Colleen Potter, Deborah Presley, and Denise Spagnolia, who, by the way, had a 379 efficiency rating, which was about at the top. But there are examples of Asian employees who also struggle. If the court takes a look at the – and there are about 160 pages or so of employee counseling notices that were given to Asian employees during this period. There were Asians who were part of the reduction, weren't there? And there were Asians who were part of the reduction. But even with respect to counseling reports, if the court looks through it, the court will see that Likud Dang was terminated at about the same time, within, I think, a couple weeks of Elaine Stites, for this very same reason, failure to maintain a minimum 170 efficiency rating. Clearly, Likud Dang wasn't receiving this very easy work product, or she was just a horrible employee. She struggled as well. But there are other examples. If the court looks at the employee counseling reports, Seth Seng received an employee counseling for failure to maintain a 170 efficiency rating. Kim Dahl also received counseling reports for failure to maintain a 170 rating. All right. But you're latching on to, I think, what was the ratio of the trial judge. The trial judge looked at this and said, Asians were fired, Asians were hired, Caucasians were fired, Caucasians were hired. That's that, right? I'm not sure it was that certain, but yes, that was... That was the crux of it, right? I guess what I'm struggling with is, perhaps if the workforce had remained somewhat similar, but in a two-year period, to flip from 10% to 90% is a fairly stark demographic change, you would admit. I would admit, although I would take exception with those percentages. That's something that was thrown out by the appellants in testimony. I don't believe it's... Okay. What's the real statistics? What's the real statistics? I mean, you're the company's counsel. What do the numbers show? It was certainly over 50%, Your Honor. It may have been as high as up to about 80% Asian workforce. All right. Well, would you concede that going from 10% Asian to 80% Asian in a two-year period is a fairly stark demographic change in the company? I would, but there's an explanation. I understand that one explanation is that the Asian employees that you had seemed to be eager to pass along employment opportunities to their friends, whereas these particular plaintiffs and perhaps other Caucasians said, I wouldn't recommend this place to anyone. Correct, Your Honor. But doesn't the fact still remain that a company cannot hide behind the notion that it fires two of one group and eight of another to say that it, ipso facto, cannot be discriminating against the eight. I mean, otherwise a company could discriminate. You could wipe out an entire demographic by simply making sure that every time you fired five members of that demographic, you fired one or two of the other demographic. I would first go back to the fact that Allen Ritchie hires based upon referrals from its existing employees. And there is testimony from Kara Taylor that the Asian employees were very willing and provided numerous applications from their friends, their family. There's testimony from the appellants that one of them, Appellant Buckman, said, I wouldn't bring anyone into torture there. Appellant Ball said, you know what? I really didn't know anyone who worked there, so I wasn't interested in referring anybody. Elaine Sykes referred her nephew, who is an Asian, and he was hired. So I think that plays into it as well. The applicant pool was mostly Asian based upon the Asian employees being more willing to provide. All right, so let's assume that we agree with you on the hiring side. Let's focus on the firing side. And you've got Yorgie and Sassany, who are supervisors and decision makers, who said Asians work better, Asians do not complain, and Asians work faster. Americans are lazy and Cambodians work more. Asian employees work harder than non-Asians, complain less, and do not call in sick. Asians are great workers, they do not complain like Americans, and they are faster workers. That's all direct evidence of discriminatory animus by two supervisors. My first comment to that, Your Honor, is in no way did Ms. Yorgie and Ms. Sassany admit that they made those. Those are disputed, I understand, for purposes of a separate judgment. They're not disputed today. Correct, I understand that. So your answer that they didn't say that seems to tell me that you should lose, because you're telling me if they did say it, you've got a problem. I understand that the court is going to accept that those comments were made for purposes of the summary judgment. We have to. Correct. Let's assume those comments were made. A lot of them relate to objective performance reasons. Asians work faster, Asians work better. But even if you accept those comments as true, there's no connection to the decision-making process because they relied on application of the efficiency ratings, which is an objective performance factor. So there was no room for these, quote-unquote, subjective comments or beliefs if they even existed. They didn't play a role in the decision-making process. You just said one supervisor did play a role. I forget who the name was. Arlene Yorgi was part of this. She is one who is alleged to have made some of these comments, and she was involved in the process, but she was bound to apply these efficiency ratings, which I think also plays into, again, if you're looking at the demographics, which – You're saying whatever her feelings, there was a mechanical – Correct. – character in this that would have overridden it. Well, if the mechanical way of doing it was – if the inputs were valid, then you're a clear winner. But the argument here is that the inputs can't be trusted, and I guess what I find challenging for your side of the case is that this isn't a case where the workers who failed on the objective criteria complained for the first time that they were at a competitive disadvantage when they hired a lawyer instead of litigating the case. There is evidence of record that there was a fairly continuous refrain by these employees and other Caucasian workers at the plant who are not part of this case who claim that Asian-O workers put Caucasian workers, inspectors, at a competitive disadvantage. And it strikes me that there are two possibilities. Either they're bad workers who are making this up or they're telling the truth. Why isn't that dispute for the fact finder? Alan Ritchie conceives that there were comments made. There was kind of an us-versus-them attitude that developed, and there were verbal complaints, nothing ever in writing, but there were verbal comments that the Caucasian or the non-Asian workers felt that the Asians were getting preferential treatment. There was an attempt, well, there were steps by management to address this. Arlene Yorgi got involved and made sure everyone was rotated so everybody had the opportunity to have both Caucasian and Asian unloaders to make sure the distribution of work was fair. The same person who made, for purposes of this stage of the litigation, who made discriminatory comments, she's the one who is to be trusted for making sure the work was assigned equally. Correct, Your Honor. She was one of the supervisors. So it was her role to do this. And we have to accept this gospel truth that when Yorgi says, I intervened to make sure the work was equally distributed, trust me, that's what happened. Why isn't that for the jury? Well, there was also Daniel Murphy who got involved, and I don't believe any of these comments have been attributed to him. How long did this involvement go on? I'm sorry, Your Honor? How long did this period, you said it was very brief when they attempted to remedy this improper distribution. How long was it? I'd have to check the record. My understanding was it was probably over a couple-month period to see if there was any validity to the claims that the Asian unloaders were favoring. And they monitored the results. Correct. And Daniel Murphy stepped in himself and distributed the work product and said, okay, if the non-Asian inspectors are claiming that they're getting, quote-unquote, crap work, I'm going to give them good work. Let's see if their numbers go up. So this is part of the legitimate reasons that you proffered to counter their case. And they then have to show that's pretext, right? Correct, Your Honor. And they would have to show you that this Arlene or whatever her name was, that she's lying or that's not true. And then also going to this idea that the Asian employees were given favorable work product. You know, you asked a couple additional questions of the appellants, and Appellant Steitz said, well, you know what? I really couldn't see in the bins. I didn't know what type of work product the Asians were getting. Because she has no idea. She can't be sure what they're getting or what they're not. It was all her subjective belief as to what is good versus what is bad. But then once she and her comrades make the complaint of the unequal distribution of work, isn't it incumbent upon the company to investigate that and see if that's, in fact, true? And isn't that the first thing the plant manager ought to find out is, are some of my employees being put at a terrible competitive disadvantage vis-à-vis their colleagues, particularly when we're going to be making these objective decisions regarding fires? And that's what Ms. Yorga and Mr. Murphy were trying to do by stepping in and making sure there was a fair distribution of work, the numbers didn't change. And also if you look at, again, there are a number of examples of non-Asian inspectors who did very well. So is there some sort of argument that those three or so just happened to get good work product? There was a two-year period non-Asian inspectors didn't do very well because non-Asian inspectors essentially disappeared from the company. I would suggest to you that if the company applied these efficiency ratings and disregarded them in their decision-making, they would be facing a much different lawsuit and one with a lot more merit in that they were throwing out objective performance factors. No, they can't do that. But what about this RIF? You claim that Dr. DeBall would let go as part of the RIF. How could it be a RIF when the company hired employees immediately before and immediately after the RIF? The immediately before and after counsel for appellants knows that those employees were already there. They were temporary employees. They were converted to full-time just about the time of the RIF. So it's not like they were- But if I'm about to do a RIF, I'm not going to convert part-timers to full-time, right? Well, Your Honor, honestly, the employees who were there and they were temporary employees and they hadn't been there nearly as long as the appellants, but they were working so much faster that they said, these are great workers, we can't let them go. We're going to keep these workers. And under the plaintiff's theory of the case, the reason their numbers were so good is because the Asian-Americans were giving them the nice game or bins to process work quickly. Which we've already discussed why that is not so. How do we know? Again, if you ask a few additional questions of the appellants, which I did, Elaine Stite said, I really didn't know. I couldn't see in their bins. Appellant Ball said, or Buckman, excuse me, she was for some time transferred to the unloader position, the position that the appellants are claiming were the ones that were feeding the inspectors. And she said, look, it's a hectic position. Everything's coming at you at once. You don't really even have time to think. And yet their theory is that these unloaders had all this time to separate what was good versus what was bad and give what was good to their Asian friends and what was bad, this calculated scheme. But they simply didn't have time. And what in the record makes that clear? How do we know that? It sure doesn't strike me as odd that an Asian unloader who's referred six friends to work at the company, some of whom probably become inspectors, would make sure that those friends who he or she referred to the company would get quality work. That doesn't seem unusual. You would expect that, wouldn't you? No, that's a fair point, Your Honor. I would give everybody the benefit of the doubt. You would expect a person to reach out to a friend and say, why don't you come work at our company? I'll help you put an application in. And once you get here, before then, I'm not going to do anything to help you. Well, I'm not going to expect human beings to act like that. To help you or hurt you, if you're struggling, then I'll try to help you, but fairly, and show you how to do the job. You're not going to give your friends, your relatives, your neighbors the better work? I wouldn't. And I don't think there's any evidence in the record, Your Honor, that that's what happened here. I think it's entirely speculation. You were speaking a moment ago in response to Judge Horton's question about, for lack of a better word, the replacements. And you answered the ones that were pre-RIF, the temporary people who had been working on a temporary basis, but who were so much more efficient than those who were terminated. But the ones that were post-RIF, these were seasonal workers, weren't they? Well, 20 non-Asians hired between 2006 and 2007. The ones post-RIF were exclusively or almost exclusively seasonal workers, were they? Your Honor, I know what the time frame of the appellate is referring to. And he says in that time frame, only Asians were hired. But you have 20 non-Asians hired. And those are only individuals who self-identified themselves as non-Asian. I believe there are others. I'm not going to guess as to what they considered their race was, but just looking at the names, I think there are probably more than 20 employees who were hired post-RIF. This was a very active workforce. It's not an easy job. It's very tedious. There's a lot of pressure to work very quickly. And there's a lot of turnover. And so the employees who were hired after RIFs, I think you might see some in April or May after a February RIF, they were to replace additional employees who left after the RIF, either because they couldn't take the work anymore or I believe one of them went on leave, I believe one of them had an accident. So they were stepping into the slots of other employees who had left. If you look at the number of employees at this plant, there was a steady decline from 2003 to 2004, 2005. And your honors may have seen a news report this morning that I believe hard copies of mail that the Postal Service is delivering is down 29% since 2004. That had a great effect on this business. And in fact, as I noted in a footnote, all of these plants just recently closed. I was going to ask you about that. The contract wasn't renewed. They were all going to close in November. Correct. And that has happened. They were all closed. Now, there are still other companies that are doing this business who apparently had outbid Alan Ritchie for the plant. But Alan Ritchie is out of business. It's not out of business because it does have other businesses. But in the mail transport equipment servicing, it no longer does that. Thank you. Since your time is limited, would you start by addressing Mr. Walsh's argument that your clients couldn't know what was in the bins? Why isn't that speculation that dooms your claim of unequal distribution of work? Well, I don't think the record is clear that at every moment they couldn't identify anything regarding who was getting what work. Well, show us where they identified something. Well, what were they supposed to do while they're working? We're sitting here working. He's Asian. I'm not. I'm going to go over and look at his bin every five minutes to see what he's got in there? I mean, how could that be done practically? Well, it wasn't that they were going over. I think it was that for periods, my clients were waiting for work because nothing was being brought to them. So even if I concede, which I don't, that they couldn't identify that Asians were getting better work, there were periods of time where they literally witnessed the Asian unloaders wheeling these pallets to Asian employees, and they were waiting for work. I don't remember seeing that in the papers, that they didn't have any work to do. There were periods where they were waiting longer periods of time. You allege there was downtime, and you allege half bins, half gay bars. Show us on the record where that is. It's going to take me a little while. I don't know where that is. You don't know where it is? Okay. It's specific. If you want to send me a 28-J letter pointing that out to us. You understand that concern. It's not enough for your clients to speculate. Their opinion that they got unequal distribution of work isn't going to cut it. You need some evidence, don't you? Yes. Tell us what that evidence is. What I just stated, that in addition to what they observed when they looked up while they were waiting for work, there were periods of time where they were literally waiting for work. They had to wait much longer periods than Asian employees. The fact that the discrimination in that respect was— How many times did that happen? A lot of times is what their testimony was. Monthly, weekly, daily? Daily. Every day they sat there and waited for the bins to be delivered when their Asian counterparts had a steady stream of work. That's what they're claiming? I don't know if it's daily, but it's for over a period of time. You just said it was daily. I may be mistaken. I guess the point I'm trying to make is they were complaining that they had to wait for work. We understand they were complaining. That's clear. I think Mr. Walsh would concede they were complaining. What we're asking is where is the evidence beyond opinion that there was an unequal distribution of work such that the objective criteria—and they are objective—cannot be trusted and, in fact, are discriminatory? Their testimony, which is in the appeal record that we submitted, that they had to wait much longer periods of time to get work compared to Asian employees. If Asian employees are discriminating and giving work to their friends and their relatives, they don't have to wait for work, so their pallets keep piling up. Since you're not willing to set the record now and we put you on the spot, why don't you in the next three days submit whatever you'd like in writing to the record to show us evidence as opposed to supposition or opinion regarding that issue? I would do that, Your Honor. Any other questions? No. Thank you. Thank you, Your Honor. We'll take the case under advisement. Mr. Walsh, you're free to submit as well. Okay. Thank you, gentlemen. The case was well weighed.